SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

**Paul J. MONTLE, LS Capital Corporation, Paul V. Culotta, Carol C. Martino, CMA Noel, Ltd., Mario J. Iacoviello, Ilan Arbel, and Europe American Capital Corporation, Defendants.**

No. 98 CV 3446.

United States District Court, S.D. New York.

March 3, 2003.

Daniel J. Goldstein, Carmen J. Lawrence, Rebecca A. Buder, Theresa M. Ward, S.E.C., New York, NY, Henry Klehm, III, S.E.C., Northeast Regional Office, New York, NY, for S.E.C.

Paul A. Batista, New York, NY, for Carol C. Martino, CMA Noel, Ltd., JTM Ltd., Gerard Haryman.

## ORDER ADJUDGING PAUL J. MONTLE IN CIVIL CONTEMPT

MILTON POLLACK, Senior District Judge.

Plaintiff Securities and Exchange Commission (SEC or Commission) renews its motion to hold Defendant Paul J. Montle in civil contempt for violating this Court's July 12, 2001 Judgment Order, January 17, 2002 Document Production Order, and May 3, 2002 hearing Order. For the reasons set forth below, the Commission's motion is granted.

### Background and Findings of Fact

Defendant's misdeeds, stretching back more than ten years in this case, involved three clusters of securities violations. The Commission's suit, filed May 14, 1998, alleged Defendant (1) knowingly disseminated false sales figures and other information regarding the HIV drug Fluorognost, in an effort to pump up the stock price of (and defraud investors in) Viral Testing Systems Corporation (VTS), which sold the drug; (2) knowingly made a series of false statements in various SEC filings of the Lone Star Casino Corporation, a wholly-owned subsidiary of VTS, in an effort to circumvent Colorado's gaming laws for the sake of an important investor; and (3) orchestrated a sophisticated stock manipulation scheme, in which shares of RMS Titanic, Inc. (a company owning a partnership that purportedly held rights to salvage artifacts from the sunken luxury ship *Titanic*) were alternately released into and withheld from the market, in an effort to bilk unsuspecting investors of thousands of dollars.

On July 12, 2001, after a three-day bench trial, this Court concluded that Defendant had violated, in connection with his various schemes, the following provisions: § 17(a) of the Securities Act of 1933 (Securities Act), 15 U.S.C. § 77q(a); §§ 10(b), 13(a), and 13(b) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. §§ 78j(b) & 78m(a) & (b); and Rules 10b–5, 12b–20, 13a–1, 13a–13, and 13b2–1 promulgated under the Exchange Act, 17 C.F.R. §§ 240.10b–5, 240.13a–1, 240.13a–13, 240.12b–20, and 240.13b2–1. Defendant personally profitted from his knowing violations of these laws and rules. Moreover, this Court found that "all of the Defendant's testimony on issues that were dis-

puted was without even the semblance of credibility." [1]

In the Court's July 12, 2001 Judgment Order, Defendant was (1) permanently enjoined from violating the securities laws and rules mentioned above; (2) barred, for five years, from participating in the sale of securities under Regulations D and S of the Securities Act, and from serving as an officer or director of any company having a class of securities registered under § 12 of the Exchange Act; (3) ordered to pay, within 30 days of the Judgment, a $50,000 civil penalty pursuant to § 20(d) of the Securities Act; and (4) ordered to disgorge, within 30 days of the Judgment, the $187,459.25 that he obtained as a result of his Titanic manipulation scheme, plus $177,633 in prejudgment interest.[2] The monies due and payable to the SEC within 30 days of July 12, 2001 thus totalled $415,092.25 (collectively, the "Judgment").

By mid-August 2001, when the 30 days were expired, Defendant had paid none of the Judgment. (In fact, to this date he has paid none of it.) Meanwhile, the SEC, to its detriment, took no immediate action to enforce the Judgment when it became due. A month later, the September 11 terrorist attacks destroyed the New York offices of the Commission at 7 World Trade Center. Some of the documents that Defendant had produced earlier to the SEC were lost, and the case was delayed.

On November 21, 2001, in order to determine Defendant's ability to pay the Judgment, the SEC served him with a first set of post-judgment requests for production of documents relating to his assets. Making several spurious arguments, Defendant refused to produce these requested documents, which included all federal, state, and local income tax returns (dating from tax year 1993) that he signed on behalf of any entity. On January 17, 2002, the Commission filed a motion to compel production of the documents, and the Court issued an order compelling Defendant to produce them by January 24 (Document Production Order). By January 30, Defendant still had failed to produce the documents, and the Commission filed a motion to hold him in contempt for violating both the Judgment Order and the Document Production Order. In February, days before Defendant's opposition papers were due on the contempt motion, he filed a Chapter 11 bankruptcy petition in the U.S. Bankruptcy Court for the Southern District of Texas. That filing automatically stayed proceedings in this Court [3] until, on April 15, 2002, U.S. Bankruptcy Judge Karen Brown dismissed the petition as filed in bad faith (i.e. solely as a means to obtain an automatic stay on further proceedings in this Court). On April 19, this Court entered an Order resetting Defendant's response time on the pending contempt motion to April 26, and set a May 3 hearing date.

By memo endorsement on the transcript of the May 3 hearing (hearing Order), the Court, in a spirit of clemency, held the

---

1. See SEC v. Montle, 98 CV 3446, *Findings of Fact and Conclusions of Law*, July 12, 2001, at 1; see also id. at 1–2 ("Defendant's testimony was infected by the same variety of distortion and outright falsehood that accompanied his deceptions in the arena of publicly held companies. Furthermore, the years that have passed between the time period that was the subject of this litigation and trial apparently have done nothing to soften Defendant's attitude.").

2. The Judgment was unanimously affirmed by the United States Court of Appeals for the Second Circuit on December 9, 2002. *SEC v. Montle*, 53 Fed.Appx. 144 (2d Cir.2002).

3. Enforcement of the Judgment was automatically stayed pursuant to 11 U.S.C. § 362. Defendant also attempted to halt proceedings by filing a motion with the Court of Appeals to stay enforcement of the Judgment pending appeal. The Court of Appeals denied the motion on March 5, 2002.

contempt motion in abeyance and ordered Defendant to submit to an immediate deposition and discovery proceeding at the offices of the SEC. The deposition was for the purpose of determining with specificity what assets he had that were lawfully available to be turned over forthwith to the Commission or a court-appointed receiver. At the close of the hearing the Court explicitly warned Defendant on the record that:

> Any resistance or obfuscation to that deposition and discovery and disclosures required thereunder will be grounds for an immediate application to this Court on one day's notice to consider and decide so much of the contempt motion as being laid aside at this time for the requisite discovery, disclosure and transfer to the SEC or otherwise of assets appropriately obtainable in satisfaction of its judgments.... You have heard the Court's indication and the degree of future tolerance.[4]

The SEC took the deposition one week later, on May 10, 2002.

The Commission, apparently concluding–in the Court's view, erroneously–that Defendant was unable to satisfy any portion of the Judgment, and that he had satisfactorily produced the relevant infor-

mation and documents, took no further action against him until January 8, 2003.[5] On January 8, it renewed the contempt motion, citing newly discovered information that Defendant had concealed at the May 10 deposition a Canadian securities account that he controlled. In its motion papers, the Commission submitted documentation from the Canadian firm showing that at the time of the deposition, Defendant controlled some $115,000 in stock assets in the account. Meanwhile, in the eight months after the deposition, the account–on which Defendant was listed as the sole beneficiary–had been depleted to $45,000. An employee of the Canadian firm stated to a representative of the Commission in January that Defendant had recently been calling his office "two to three times a day" demanding that monies from the account be released to him, including more than $40,000 that Defendant alleged was misappropriated from the account by an employee of the firm. These facts, taken together, cast a deep and dark shadow of doubt on the veracity of Defendant's claims at the May 10 deposition with respect to his foreign accounts.[6]

On January 23, 2003, the Court held a hearing on the renewed contempt motion. In opposition papers and orally at the

---

**4.** *Transcript, SEC v. Montle,* 98 CV 3446, May 3, 2002, at 16–17.

**5.** As noted below, the SEC did not furnish a complete copy of the May 10 deposition to the Court until February 10, 2003, after the Court made inquiry. The deposition makes it clear to the Court that, among other things, Defendant was (and is) able to pay at least *some* portion of the Judgment, even if only on an installment basis.

**6.** The most obvious obfuscation is contained in the following exchange:

"**Q.** Have you ever kept any bank accounts or securities accounts or any other type of account either in your name or someone else's name where you had any kind of control over the account in any foreign country?

**A.** Yes.

**Q.** Where?

**A.** Ireland.

**Q.** Anywhere other than Ireland?

**A.** Well, I had a brokerage account in Canada at one point.
[**Defendant's attorney:**] In the 1990s? That's his question.
[**SEC attorney:**] No. I am asking at any time.

**A.** At one point I had a brokerage account at a Canadian brokerage firm because I was trading in some Canadian stocks.

**Q.** What was the name of that *firm?*

**A.** *Global* Securities.

**Q.** How long did you have that account?

hearing, Defendant's attorney made various implausible efforts to explain away the obfuscations in the sworn deposition testimony. He also informed the Court that Defendant had communicated to the SEC a settlement offer of $125,000, to be paid with borrowed funds, in full satisfaction of the Judgment. He renewed the settlement offer on behalf of Defendant, who did not attend the hearing.

In light of these facts, the relevant case-law, and especially the Court's explicit warning to Defendant to avoid "resistance or obfuscation" with respect to disclosing all of his assets at the May 10 deposition, it was well within the Court's discretion to hold Defendant in civil contempt on January 23 and order him, as the Commission requested, imprisoned and fined up to $10,000 per day until he complied with the Court's previous Orders. He had failed to pay a penny of the Judgment, he had failed to produce documents in response to the Document Production Order, and he had concealed assets at the deposition in violation of the hearing Order. Electing once again to give an otherwise difficult Defendant every benefit of the fast-shrinking doubt, however, the Court instead ordered him, by memo endorsed transcript, to turn over within one week (by January 30) the $45,000 identified by the SEC in the Canadian securities account, as well as certain other shares that were possibly held in an account at Tucker Anthony Sutro Capital Markets (or proceeds from the sale of such shares if they had already been sold). At the same time, the SEC's attorney was ordered to submit Defendant's settlement proposal–the offer to pay $125,000 above and beyond the Canadian monies and the Tucker Anthony shares–to appropriate Commission authorities for acceptance or rejection.

When no report from the Commission or Defendant's counsel had been received by February 6–two weeks later–the Court made inquiry and learned that the SEC had been unable to obtain any of the Canadian monies because a third party had laid a competing claim to a portion of the funds.[7] The SEC also said that the supposed $45,000 in the account was apparently in Canadian dollars, which translated to

---

A. Well, I think the account is still open but it doesn't have anything in it. I think it was opened maybe in '97 or something like that.

Q. Is the account in your name?

A. Yes.

Q. Has it always been in your name?

A. Yes."

*Transcript*, Deposition of Paul J. Montle, May 10, 2002, at 41–42 (emphasis added).

Here it is clear that in response to direct questioning relating to disclosure of *all* of his ownership interests in foreign accounts, Defendant made no disclosures other than having an account in Ireland and having an *empty* account *in his own name* at *Global* Securities in Canada. In fact, however, at the time of this exchange, Defendant controlled a shell company called Glenogra Limited that had approximately *$115,000* squirrelled away in an account *in its name* at *Yorkton* Securities in Canada.

The records of the Yorkton Securities account, together with the SEC telephone calls to representatives of Yorkton Securities, more than make plain that Defendant knew about, and obfuscated his ownership interest in, those assets–both at the May 10 deposition and subsequently. Defendant most certainly knew about the Yorkton account, and he knew that the shares in the account were in the name of Glenogra, a company that he controlled. These facts had to have been fresh in his mind because he had, shortly before, pledged some of the shares to another company. Documents submitted to the Court by Defendant's attorney show clearly that on or about April 30, 2002–only roughly ten days before Defendant's deposition–Defendant had pledged half of the shares that he owned in the Yorkton account to the EquiTrust Mortgage Corporation.

7. The Canadian securities firm, for legal reasons, was apparently unable to release any funds at all from the account because of the competing claims.

roughly 28,000 U.S. dollars. Moreover, contrary to the Commission's expectation, no shares were found at Tucker Anthony, nor were any proceeds turned over from the sale of any such shares.

In an overabundance of fairness to Defendant, the Court decided to put pressure on the Commission. By letter, the Court again requested that the Commission's attorney submit the Defendant's once-and-for-all settlement offer to the full Commission for acceptance or rejection, which had not yet been done. The Court also ordered the Commission to submit a complete copy of the transcript of Defendant's May 10 deposition, which it had never previously done.[8]

On February 13, 2003, in response to the Court's letter, the Commission's attorney reported that he had presented Defendant's settlement offer to the full Commission. The Commission rejected the offer. The Commission's attorney also brought to the Court's attention the fact that Defen-

dant's attorney, in papers filed in opposition to the renewed contempt motion, had misquoted–in the Commission's view, deliberately–Defendant's May 10 deposition testimony. The misquoted text had been used to support an overall representation to the Court that Defendant had not really attempted, after all, to conceal the funds in the Canadian account.[9]

Meanwhile, the Court by this time had had its first opportunity to digest the entire transcript of the May 10 deposition. The transcript gave a much fuller picture of Defendant's income, assets, expenses, obligations, and frankly, obstructionism, than the Commission had ever before brought to the Court's attention. Each of these areas is briefly treated below.

On the one hand, Defendant painted a portrait of himself as a man with virtually no income or assets. He stated that he had no current employment[10] and no income in recent months other than from the liquidation of securities that he owned.[11]

---

8. Only excerpts, containing approximately 28 pages of the 180–page deposition transcript, had been submitted to the Court before February 10, 2003.

9. The Commission had no opportunity to bring this information to the Court's attention at the January 23 hearing on the renewed contempt motion. Defendant's attorney submitted the papers containing the misquote to the Court only approximately an hour before the hearing–during the lunch hour–and to the Commission's attorney just minutes before the hearing.

The Court would like to believe, in an abundance of charity, that the misquote was simply an oversight, but long experience sadly gives reason to admit at least the possibility of less noble factors at work. In any event, and more important, Defendant's attorney uses the misquoted passage out of context. At the same time, he conveniently ignores the more significant passage of the deposition transcript pertaining to the Canadian account. In that passage, Defendant specifically claims that the Canadian account was *empty* –even though he almost certainly knew that the

truth was otherwise because, only ten days before, he had pledged a portion of the shares in the account to the EquiTrust Mortgage Corporation. *See supra* note 6.

10. For example, the following exchange relating to income took place:

"**Q.** And I think you said before, currently you are not doing any work for pay at all?

**A.** Correct.

**Q.** What do you spend your time doing these days, Mr. Montle?

**[Defendant's attorney]** Reviewing briefs.

**A.** Helping [defendant's attorney] write the rebuttal to the SEC's brief and the appeal. I spend quite a bit of time doing that. Researching the law about debtor's prison in the United States, that was quite a little exercise. I am very under-utilized. I read the Wall Street Journal, watch television, talk to friends on the phone."

*Transcript,* Deposition of Paul J. Montle, May 10, 2002, at 93.

11. In view of this claim, it is interesting to note that Defendant also claimed, in a sworn

He said that even this liquidation income–which, the Court notes, amounted to a whopping *$20,000 per month* –was, unfortunately, running out very fast. The stock was almost all gone. The $15,000 and 50,000 shares of stock that he had earned doing consulting work in the previous year were gone. He admitted earning millions of dollars in the 1980s and 90s, but said that all of that money was gone too, spent mostly on the lavish lifestyle of his former wife, whom he had divorced five years before. All of the partnerships in which he had held an ownership interest were broke. His bank accounts, IRA accounts, and securities accounts were all bled dry. The horses that he had purchased for horse shows had all been sold, or were very old.[12]

At the same time, Defendant was painting another very interesting portrait of himself as a man with staggering expenses and financial obligations. In the deposition, Defendant stated that he had the following monthly expenses: $10,000 in legal fees; $4555 in alimony payments (an obligation that would continue through March 2007, he said); $4000 for rent of his main residence in Brookline, Massachusetts;[13] $550 for the lease payment on his 2001 Saab automobile; $300 for gasoline and repair expenses on the Saab; $300 in telephone bills; $300 in life insurance premiums; $200 for cable television and internet service; $200 for charitable contributions to a struggling church; $125 for dry cleaning;[14] and assorted medical and dental expenses for himself and his daughter. The total was over $20,000 per month. In addition, Defendant admitted that he financed, within roughly one year prior to the deposition, a trip to Ireland, a ski trip to Colorado, an investment trip to California, a trip to Florida to visit with a former co-defendant, and a gift of "a couple of thousand dollars" to his girlfriend so that she could pay the rent on their Houston town house.

A final theme, Defendant's obstructionism, emerged from the transcript. To take one example, he had failed to produce key records, most notably all of his tax returns from 1997 forward. When first asked about these returns at the deposition, Defendant claimed that his personal copies of the documents had been lost during a move from Houston to Brookline. He said that he could produce his accountant's copies of the documents within two weeks perhaps–if he could manage to

affidavit submitted in opposition to the first contempt motion, that "I *earn* approximately $25,000 per month and spend $24,500 each month." *See Declaration in Opposition to Motion for Contempt* dated April 24, 2002, at 2 (emphasis added).

12. In fact, the only real income that Defendant might expect to receive in the near future, he said, was from winning a lawsuit that he had filed in Ireland, and from another suit that he expected to file:

"**Q.** Do you have any prospects for any additional income other than what is listed in the bankruptcy filing?

**A.** Yes.

**Q.** What are those?

**A.** I intend to collect a large amount of money from the SEC.

**Q.** How are you going to do that?

**A.** By filing a civil lawsuit against the agency and certain of its employees."

*Transcript,* Deposition of Paul J. Montle, May 10, 2002, at 91–92. Defendant also stated that he believed that he could obtain employment as an officer of a public company, if the officer and director bar imposed by the Judgment were lifted on appeal.

13. The amount of money Defendant contributed monthly for another residence that he identified, in Falmouth, Massachusetts, was never specified in the deposition.

14. Defendant reduced this figure from the $500 originally claimed on his Texas bankruptcy petition, stating that the larger figure was a typographical error.

scrape together the funds necessary for paying the accountant an outstanding bill.[15] When asked about the returns later in the deposition, however, Defendant stated that he had not filed any returns for 1998, 1999, 2000, and 2001 (he said that he had filed in 1997). He said that he would face no penalty for not filing in these years because, he believed, the Internal Revenue Service owed him between $25,000 and $50,000. Nonetheless, he said, he had sent his accountant within the past month all of the documents necessary to prepare the returns, and once the returns were prepared he would forward them to the Commission. When asked, he could not explain why he had not already sent the Commission copies of the documents that now had been sent to his accountant for use in preparing the returns.

The implications of all of these facts are clear. First, it is highly implausible that this Defendant has virtually no assets or income and at the same time can afford such enormous expenses. He is either hiding assets or grossly exaggerating expenses, or both, in an attempt to delay or avoid paying the Judgment. Second, Defendant's high monthly expenses, and the sizeable income (derived from whatever source) necessary to defray them, presumably continued unabated in the *nine months* between the Judgment due date and the date of Defendant's deposition–not to mention during the additional nine months between the deposition and now. The Commission could have seized upon these facts when they ultimately emerged and effectuated a garnishment on Defendant's income or fashioned some other proposed remedy. Ironically, Defendant's attorney himself boldly raised the garnishment question in more than one of his submissions to the Court and opposing counsel.[16] Third, the obstructionism and

---

**15.** The transcript account, reproduced below, is illuminating on this point. Defendant admits that the returns are vitally necessary, and that he did in fact possess copies of the returns (plural) at a certain point in time in the past. (The Commission first requested the tax returns in November 2001.)

"**Q.** How come you haven't given [tax returns from 1997 forward] to us up to now?

**A.** Because I didn't have them to copy.

**Q.** Why didn't you get them from [the accountant] up till now?

**A.** My life, as you can see from the statements, is a juggling act. And paying legal bills and paying all the other expenses that I have to pay has taken priority over paying some things like paying old accounting bills. But I need to get them.

**Q.** Well, you gave us copies of your tax returns, or you appear to have given us copies of your tax returns from approximately 1992 to 1995; is that right?

**A.** Yes, because there is a box that had the other ones in it that is not in Brookline. When I moved stuff from Houston to Brookline it was what they call a shared load or pooled load or something. There were other people's stuff on the same truck. And when

they are unloading these boxes, I mean, I didn't count every box or take an inventory.

So when I started looking for the stuff, I realized <u>the returns that I need the most are not there</u>.

**Q.** Well, when the accountant first did the accounting work for you on those returns, didn't he give you copies then?

**A.** Yes, <u>I had copies when I was in Houston</u>. They got lost moving to Brookline.

**Q.** But the earlier copies didn't get lost?

**A.** No, they were in a different box. And I produced them. Even though I was under no requirement to have them, because they were beyond six years. I produced them. I was trying to be as responsive as possible."

*Transcript*, Deposition of Paul J. Montle, May 10, 2002, at 134–36 (emphasis added).

**16.** *See, e.g., Defendant Paul J. Montle's Memorandum in Opposition to Motion for Contempt* dated April 25, 2002, at 4 ("The SEC, of course, has not followed any of the myriad of procedures under federal and state law to collect a judgment. Virtually every legal system in the United States provides for garnishment, attachment, and other collection devices, none of which the SEC has used.").

deception apparent in the May 10 deposition might have provoked a swifter reaction from the Commission.

In short, it seems that frank disclosures from Defendant might have enabled collection of the entire $415,092.25 in Judgment monies that came due on August 12, 2001. Even if the Commission might have obtained only a portion of the Judgment, at least Defendant would not have been left free to bleed his ill-gotten gains away on ski trips, expensive automobiles, visits to Ireland and Florida, and three residences.

Nevertheless, the disruption of 9/11 on the Commission's attention to this case, no matter how fortuitous to Defendant, in no way relieved him of his legal obligation to pay the entire Judgment by August 12, 2001,[17] nor did it authorize him to play a shell game with his assets. His continuing refusal to pay a penny of the Judgment, at the same time that he maintained an admittedly extravagant lifestyle and hid assets, strikes this Court as contumacious conduct.

### Legal Standard for Civil Contempt

■ Under the law of this Circuit, a district court must make findings relating to three issues before holding a party in civil contempt:

[I]n order to hold the alleged contemnor in contempt, the court need only (1) have entered a clear and unambiguous order, (2) find it established by clear and convincing evidence that the order was not complied with, and (3) find that the alleged contemnor has not clearly established his inability to comply with the terms of the order. The court's findings of fact are not to be disturbed unless they are clearly erroneous.... Its deci-

sion to impose sanctions in light of properly found facts may not be overturned except for abuse of discretion.[18]

Further, the law states that the "alleged contemnor bears the burden of producing evidence of his inability to comply." [19] Thus, with regard to orders requiring monetary payment, for the district court "there is no requirement that the ability to pay be clearly established; what is required is that the in ability to pay be clearly established by the alleged contemnor." [20]

### Application

■ As outlined in the Findings of Fact above, the three orders at issue here were clear and unambiguous. First, under the terms of the July 12, 2001 Judgment Order, Defendant was to pay a total of $415,092.25 to the Commission by August 12, 2001. Second, under the terms of the January 17, 2002 Document Production Order, he was to produce all documents within his custody or control that were responsive to the Commission's first set of post-judgment requests for production of documents. Third, under the terms of the May 3, 2002 hearing Order, he was to avoid any "resistance or obfuscation" to the disclosures requested by the Commission at his May 10, 2002 deposition.

As further outlined in the Findings of Fact above, the Court finds, by clear and convincing evidence, that Defendant has violated the three orders at issue. First, he admits that he has not paid a penny of the $415,092.25 Judgment–while admitting, at the same time, that he has maintained a lavish lifestyle since the time that the Judgment became due and payable. Sec-

---

17. As noted above, Defendant's application to the Court of Appeals for a stay of enforcement of the Judgment was denied on March 5, 2002. The Judgment was affirmed on December 9, 2002. *See supra* notes 2 & 3.

18. *Huber v. Marine Midland Bank,* 51 F.3d 5, 10 (2d Cir.1995).

19. *Id.*

20. *Id.* (underlined emphasis added).

ond, he has failed to produce all of the documents required under the Commission's first set of post-judgment requests for the production of documents.[21] Third, he has failed to avoid "any resistance or obfuscation" to the disclosures required at the May 10, 2002 deposition.[22]

Finally, this Court finds, for all of the reasons outlined in the Findings of Fact above, that Defendant has failed to establish his inability to comply with the three orders. He has not shown that he cannot pay the Judgment; on the contrary, he has shown that he almost certainly can.[23] He has not adequately shown that he cannot produce the documents required by the Document Production Order. He has not shown that he was unable to avoid obfuscation regarding the assets in the Yorkton Securities account.

### Conclusion

The Commission has asked this Court to impose sanctions of $10,000 per day upon Defendant until he complies with the Court's previous Orders, and if he fails to comply within ten days, to incarcerate him. The Commission has also requested that Defendant be ordered to turn over certain assets and valuables identified at the May 10 deposition and subsequently.

Nevertheless, this Court will give this Defendant one last opportunity to obey its previous Orders. Defendant shall (1) pay $10,000 per month to the SEC,[24] (2) fully comply with the Court's January 17, 2002 Document Production Order, and (3) turn over to the Commission certain assets and receivables, to the extent that they are now (or in the future become) in his custody, control or possession, identified in the

21. Most notable here are the tax returns from the years 1997 forward, which he himself called "the returns that I need the most" but which he also claimed to have lost during a move from Texas to Massachusetts. *See supra* note 14. Defendant admits that he had access, during the roughly four months between the Document Production Order and the deposition, to the documents necessary for preparing the missing returns, but says that he nonetheless sent all of those documents to his accountant during the month prior to the deposition–without retaining copies of them or sending copies to the Commission. The Court finds this remarkable chain of events to be strikingly fortuitous, but highly implausible.

22. Most notable is the concealing of $115,000 in stock assets in the Yorkton account, some shares of which he pledged to the EquiTrust Mortgage Corporation only days before the May 10 deposition. *See supra* notes 6 & 9.

23. The Court is convinced that Defendant has the ability at this time to pay something toward, if not all of, the Judgment. He has admitted both in his bankruptcy schedules and in his discovery testimony to receiving and spending income of $25,000 a month since the Judgment became due. The sources and availability of that income have been obscure. He has also admitted that he can borrow $125,000 in funds that he would use to settle this case with the Commission. Moreover, he expects to collect between $25,000 and $50,000 from the Internal Revenue Service. He has stated in his deposition that he also hopes to collect further monies from an undefined contemplated civil lawsuit against the SEC and unspecified members of its staff.

24. **The first payment must be posted by March 13, 2003 and subsequent payments must be posted by the fifteen of each month.** Payment shall be made by U.S. postal money order, certified check, bank cashier's check, or bank money order payable to the order of the United States Securities and Exchange Commission. Payments shall be transmitted to the Comptroller, Securities and Exchange Commission, 450 Fifth Street NW, Washington, DC 20549, under cover of a letter identifying Defendant, the name and docket number (98–CV–3446) and SEC number (N.Y.–6136) of this case, the court in which it was brought, and the nature of the payment as disgorgement and prejudgment interest. A copy of each cover letter and payment (front and back) shall be simultaneously transmitted to the Commission's attorney for this matter in New York.

Commission's Supplemental Memorandum of Law in Support of Its Renewed Motion for Civil Contempt and elsewhere.[25]

Defendant has been found in contempt. If he disobeys this Order in any respect, or defaults ten days from the date hereof in any respect of the foregoing, the Commission may move this Court, by order to show cause returnable in five days, for an order of commitment.

So ordered.

25. These items include: (1) Defendant's Salomon Smith Barney Keogh account (last reported to contain $2000 in securities), (2) Defendant's Alex Brown account (last reported to contain $2200 in securities), (3) Defendant's Comprehensive Capital account (last reported to contain $17,835 in J.V. Web and Viseon stock), and (4) any stock (or proceeds from such stock if sold) in his account at Tucker Anthony Sutro Capital Markets. In addition, Defendant must assign to the Commission his right to payment of, and must pay to the Commission, to the extent necessary to satisfy the judgment: (1) any income received or to be received by Defendant (or any person or entity he controls) from the Hagan Manor Partnership (last stated to be under $4000 per year), (2) the proceeds of, or consideration received from, any sale or transfer of Defendant's interest in the Hagan Manor Partnership, (3) any payment due, or to become due, to Defendant from the United States Internal Revenue Service, (4) any shares or proceeds now available to him or that become available to him from the Glenogra–Yorkton Securities account in Canada, and (5) any existing or future judgment awards from any court, foreign or domestic, including from the pending libel suit in Ireland and the claim against Yorkton Securities for alleged misappropriation of funds in the Glenogra account.